# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00701-COA

**BILOXI DOCK & ICE, LLC**                                                    **APPELLANT**

**v.**

**BACK BAY FUEL AND ICE, LLC**                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2021 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | HENRY LAIRD |
| | FREDERICK T. HOFF JR. |
| ATTORNEY FOR APPELLEE: | ROBERT ALAN BYRD |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 05/31/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.

### BARNES, C.J., FOR THE COURT:

¶1. Back Bay Fuel and Ice LLC (Back Bay) is a limited liability company that was formed in March 1997 by its (then) sole member, Robert Fayard. On March 26, 1997, Back Bay (also referred to as Lessee) entered into a five-year lease agreement (Lease) with R.A. Lesso Seafood Inc. (Lesso; also referred to as Lessor) for a parcel of land located at 598 Bayview Avenue in Biloxi, Mississippi. The Lease contained an option to extend the lease for seven additional five-year terms, which renewed automatically. Back Bay used the leased premises as a commercial icehouse facility, a fuel dock, and a facility for storing and dispensing fuel.

¶2. In August 2005, Hurricane Katrina destroyed Back Bay's diesel fuel tank. A person

named Michael Cooper purchased Back Bay from Fayard in 2006. Cooper installed a new fuel tank in the exact location as the previous one, which was later discovered to be outside the leased premises.

¶3.     In early 2019, Lesso began negotiations to sell the property. The potential buyer, Biloxi Dock & Ice LLC (BDI), hired Southern Environmental Management & Specialties (SEMS) to conduct environmental testing. On February 5, 2019, SEMS issued a Phase II Environmental Site Assessment, which indicated that "diesel fuel/engine oil constituents in the form of polynuclear aromatic hydrocarbons [PAH] [were] present in soil in concentrations that exceed Mississippi Department of Environmental Quality (MDEQ) Tier 1 TRG standards."

¶4.     On February 7, 2019, BDI's attorney sent Cooper a letter via certified mail, informing him that the environmental issue constituted a default under the terms of the Lease. Specifically, Article XIII of the Lease, entitled "Environmental Matters," provided in part, "Lessee will not cause or will not permit to be caused, any act or practice, by negligence, omission, or otherwise, that would adversely affect the environment or do anything or permit anything to be done that would violate any of said laws, regulations or guidelines." The letter requested that Back Bay address the fuel-leakage issue "immediately" and that the failure to do so would "be considered an event of default pursuant to the terms and conditions of the Lease." However, the letter's return-service receipt came back and indicated the letter was unclaimed.

¶5.     The sale of the property between Lesso and BDI was completed on March 1, 2019.

2

The Lease was assigned to BDI as part of the sale, and BDI requested that SEMS conduct a Phase III Environmental Site Assessment. Paragraph (c)(iii) of Article XI of the Lease provided that the Lessor may "enter on and into the premises and cure any then uncured Event of Default at the expense and for the account of Lessee"; so SEMS—on BDI's behalf—entered the premises and completed remediation of the environmentally contaminated soil. The cost for the Phase II Environmental Site Assessment, the Phase III Environmental Site Assessment, and the remediation of the contaminated soil was $74,001.50.

¶6.     On March 18, 2019, BDI sent an email to Back Bay's counsel regarding the alleged breach of the Lease's terms. The email also noted additional concerns, particularly that the "the fuel tank [was] located outside of Back Bay's leased area . . . [and] no longer satisfies environmental or building code standards due to damage and poor repair of the containment wall."

## PROCEDURAL HISTORY

¶7.     On July 10, 2019, BDI filed a complaint against Back Bay for unlawful entry and detainer and for other relief with the Harrison County County Court, and a hearing before the county court was scheduled for July 29, 2019. Back Bay filed its answer on July 24, denying (1) that it was responsible for any soil contamination or (2) that BDI was entitled to any relief. Back Bay also asserted that it had not violated any state or federal regulations nor any environmental laws.

¶8.     At the July 29 hearing, Rudy Lesso testified that prior to his purchase of the property

3

in 1978, the land had not been used for commercial purposes, nor were there diesel fuel tanks on the property. He said Back Bay had built the icehouse and installed the fuel tank in 1997. On cross-examination, Rudy acknowledged that at the time of its execution, the Lease provided that "[n]either lessor or lessee are aware of any existing environmental concerns." Rudy also admitted that he never had an issue with the fuel tank's being located outside the leased premises.

¶9.     George "Sonny" Blackwell testified that he had "surveyed the property at the request of [BDI's] insurance agent" on April 15, 2019. Blackwell opined that the ammonia tank located in Back Bay's icehouse posed a potential danger, yet he did not test the ammonia tank, nor was he aware if there was any ammonia in the tank. His loss-control report stated, "The current state of conditions makes it very unlikely to pass the scrutiny of an insurance carrier risk assessment survey." However, Blackwell admitted while all the identified risks in his report were based on whether there might have been fuel in the tank, he was not aware of whether the tank had fuel in it.

¶10.    Jerry Sossamon, a senior consultant for SEMS, conducted the environmental studies for BDI. Regarding whether the contaminants identified in his study were hazardous, he explained: "That depends on which sets of regulations you're talking about. For transportation, they're hazardous. For landfill disposal, they're non-hazardous. And for human exposure, it's based on permissible standards developed by state agencies." When further pressed by counsel as to whether the MDEQ would consider the contaminants hazardous, he said, "Not for remediation date, no. It's exempt - - all hydrocarbons, all fuels

4

are exempt for disposal." Therefore, he had recommended the remediation "by excavation and landfill disposal."

¶11. Sossamon admitted on cross-examination that he could not definitively determine the source of the contaminants, nor could he ascertain how long the contaminants had been on the site. He noted, "I can only conclude that it was diesel fuel, and . . . I believe it was associated with the diesel fuel line because of the excessive concentrations that were in the field sample on the diesel fuel line." Sossamon further acknowledged that during the excavation of the samples, SEMS had broken the fuel line and had to repair it. Sossamon was unaware that the previous fuel tank had been destroyed during the hurricane. Although he said any residual fuel would have floated off in the water, he did explain to the court that had the fuel tank not flooded, "there's certainly a chance of an impact of soil and groundwater because it sets on the surface and can seep into subsurface soils." Sossamon also acknowledged that "fuel dock is outside the assessed area." He told the court that he did not confirm whether there was any fuel in the tank.

¶12. Cooper, Back Bay's owner, testified that he never saw a survey of the leased premises before 2019. He said Lesso had never complained about the fuel tank's placement. Cooper asserted that there had never been any fuel leaks associated with the tank and that Gulf Hydraulics conducted pressure tests of the tank annually. He also said the United States Coast Guard (USCG) had inspected and certified the fuel lines. It was Cooper's opinion that Back Bay was in compliance with the Lease's requirements. On cross-examination, Cooper said he was not aware of any fuel-line leak prior to his ownership. He admitted that he did

not conduct any environmental testing before taking over the Lease. Cooper again denied on redirect examination that Back Bay had caused the soil contamination.

¶13. The county court, sitting as the fact-finder, dismissed BDI's complaint on February 19, 2020. In its final judgment, the court noted that since Cooper's ownership of Back Bay, the fuel tank had been "inspected by the [USCG,] . . . [and] for the last two (2) years, the fuel lines have been tested by Gulf Hydraulics." Noting that Sossamon "could not determine the source of the PAH nor when it appeared or migrated to the property," the county court concluded "that there was no proof that Back Bay, under the ownership of Mike Cooper, caused any leakage of fuel oil[.]" Additionally, the court noted Back Bay had "exclusively operated a fuel tank on the disputed property in excess of 20 years without any contention from the [L]essor." Thus, the court determined that Back Bay was "entitled to possession of the subject property" under the doctrines of adverse possession and equitable estoppel.

¶14. BDI appealed from the judgment to the Harrison County Circuit Court, and a hearing was held on May 7, 2021. Counsel for BDI argued that the appellate standard of review for the court was de novo, as the case involved the interpretation of statutes, regulations, and the Lease's terms. Back Bay's counsel asserted: "The [M]DEQ has never cited Mr. Cooper or his company for any violations. There's never been any reports of any leaks or spills while he has owned the company. There's been no complaints from the Coast Guard, the EPA, the [M]DEQ." Concluding that there was "no testimony in this record that the fuel came from these tanks" and that there was "no proof in this record at all that the lessee caused anything to adversely affect the environment or caused a violation of the laws, regulations or

6

guidelines," the circuit court upheld the county court's findings in its bench ruling.[1]

¶15. Appealing the county and circuit courts' rulings, BDI argues that Back Bay violated the terms of the Lease and that BDI is entitled to possession of the subject property. BDI further asserts that Back Bay's default of the Lease's terms entitles BDI to attorney's fees and damages of $74,001.50, including prejudgment interest. Finding no error, we affirm.

## STANDARD OF REVIEW

¶16. In cases where "the county court sits as the fact-finder, the circuit court and this Court, as appellate courts, 'are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong.'" *Turnage v. Brooks*, 301 So. 3d 760, 763 (¶9) (Miss. Ct. App. 2020) (quoting *Bacallao v. Madison County*, 269 So. 3d 139, 144 (¶21) (Miss. Ct. App. 2018)). "Further, 'the judgment of a circuit or county court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree.'" *Id*. at 763-64 (¶9) (quoting *Bacallao*, 269 So. 3d at 144 (¶21)). Questions of law are reviewed de novo. *Miss. Dep't of Env't Quality v. Pac. Chlorine Inc.*, 100 So. 3d 432, 439 (¶18) (Miss. 2012).

¶17. BDI contends that the county and circuit courts "misapplied the law in interpreting the written lease between the parties." Thus, BDI asserts that this Court should review the issues raised under a de novo standard, as they concern whether Back Bay violated MDEQ regulations and standards. We find this assertion incorrect. In *KGC Properties Inc. v. Triangle Maintenance Services LLC*, 120 So. 3d 986, 988 (¶10) (Miss. Ct. App. 2012), we

---

[1] The circuit court further noted that BDI had not challenged the county court's findings on other issues, including the finding of adverse possession, so the circuit court ruled that "those findings will stand." Likewise, BDI has not asserted any challenge here on those issues.

7

rejected an appellant's argument that a chancery court had "misinterpreted and misapplied the law," warranting a de novo review. We held that "because this issue was based on a finding of fact and not a misapplication of the law," we would "only reverse the decision if the chancellor was manifestly wrong or clearly erroneous or applied an incorrect legal standard." *Id.* Here, the county court made a finding of fact that there was no evidence that Back Bay committed the alleged violations. Therefore, we agree with Back Bay that this Court should defer to the county court's ruling if it is supported by substantial evidence and not manifestly in error.

## DISCUSSION

¶18. BDI asserts that Sossamon's testimony established that "soil in the vicinity of an underground diesel fuel line on the lease[d] premises contained PAH concentrations 'in excess of MDEQ regulatory guidance standards.'" BDI further argues Back Bay's failure to rebut this evidence at trial is an admission that "it violated MDEQ pollution standards."

¶19. As already noted, this case originated from BDI's complaint for unlawful entry and detainer, in which BDI claimed that Back Bay's alleged violations of the MDEQ environmental regulations constituted default under the Lease's terms and entitled BDI to possession of the property.[2] "In unlawful entry and detainer cases . . . the burden of proof

---

[2] Mississippi Code Annotated section 11-25-101 (Rev. 2019) provides:

Any one deprived of the possession of land by force, intimidation, fraud, stratagem, stealth, and any landlord, vendor, vendee, mortgagee, or trustee, or cestui que trust, or other person against whom the possession of land is withheld, by his tenant, vendee, vendor, mortgagor, grantor, or other person, *after the expiration of his right by contract, express or implied, to hold possession*, and the legal representatives or assigns of him who is so deprived

8

is on the complaining party to show that the defendant unlawfully withholds possession of the land in controversy." *Sistrunk v. Majure*, 186 Miss. 814, 823, 192 So. 5, 6 (1939). Therefore, the burden was on BDI to establish that Back Bay had violated the MDEQ regulations rendering it in default of the Lease. The county court, as the fact-finder, had sufficient evidence to conclude that BDI failed to do so.

¶20. When Sossamon was asked if he could "definitively . . . determine where [the] contamination came from," he said, "No." Sossamon further noted that the PAHs are not considered hazardous for remediation purposes. Cooper testified that since his ownership in 2006, Back Bay's fuel operations had been inspected by the USCG, and for the last two years, Gulf Hydraulics had inspected the fuel lines. As the county court further noted in its findings, Back Bay had received no citations for any fuel leaks from any regulatory or governmental agency. It was undisputed that Back Bay had, at all times, maintained insurance coverage on the subject property and was not in monetary default of the Lease. Lastly, as the circuit court noted in its bench ruling, BDI was fully aware "going in that this was a problem but they bought [the property] anyway[.]"

¶21. We conclude that the county court's ruling—finding Back Bay was not in default of the Lease's terms—is supported by substantial evidence and does not constitute manifest

---

of possession, or from whom possession is so withheld, as against him who so obtained possession, or withholds possession after the expiration of his right, and all persons claiming to hold under him, shall, at any time within one year after such deprivation or withholding of possession, be entitled to the summary remedy herein prescribed.

(Emphasis added).

error.  Because BDI's additional claims—that it was entitled to possession of the subject premises, attorney's fees, and damages—are premised upon a finding of default under the Lease, we find these issues are without merit.  Accordingly, we affirm.

¶22.   **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.  SMITH, J., NOT PARTICIPATING.**